UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MICHAEL A. RILEY**<br>3800 Powell Lane, Suite 119<br>Falls Church, Virginia 22041-3672<br><br>                              Plaintiff,<br>vs.<br><br>**UNITED STATES OF AMERICA**<br><br>Serve:<br><br>Attorney General of the United States<br>Main Justice Building<br>10th & Constitution Ave, NW<br>Washington, DC  20530<br><br>U.S. Attorney for the District of Columbia<br>555 4th Street, NW<br>Washington, DC 20530<br><br>U.S. Army Staff Judge Advocate<br>Claims Division<br>4217 Roberts Ave.<br>Fort Meade, Maryland 20755<br><br>Office of the Command Judge Advocate<br>Fort Belvoir Community Hospital<br>9300 DeWitt Loop<br>Ft. Belvoir, Virginia 22060<br><br>                              Defendant. | Case No. _____ |

**COMPLAINT**
**(Federal Tort Claims Act)**

1. Michael A. Riley sues the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), for injuries and damages Riley experienced because of negligence by employees of the United States at the former Walter Reed Army Medical Center (WRAMC) in Washington, D.C.

2. An administrative claim was timely presented to the U.S. Department of the Army more than six months before the filing of this Complaint. The claim has not been granted and therefore is deemed to have been denied.

3. This Court has jurisdiction over this case pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b).

4. Michael A. Riley served in the United States Air Force from 1967 until 1991, flying more than 100 missions over Vietnam and otherwise serving his country honorably until his retirement at the rank of lieutenant colonel.

5. In 2006, Riley was found to have an elevated PSA test, and a biopsy showed Gleason-6 prostate cancer. He consulted with the prostate cancer staff at WRAMC on referral from his primary doctors at Fort Belvoir. He attended a group educational session at WRAMC on the treatment options for prostate cancer, then had a one-on-one consultation with Dr. Noah Schenkman, then the head of urology at WRAMC.

6. Dr. Schenkman recommended removal of the prostate gland using a minimally invasive technique with a daVinci robot.

7. Riley was attracted to this option because it promised a shorter recovery time, due to smaller cuts than with an open procedure. Because of his own experience as an instrument-certified pilot, he was comfortable with the idea of using technology to guide delicate work.

8. Riley asked Dr. Schenkman how many robotic prostate removals he had done, and Dr. Schenkman said he and his team had done about 25 and that Dr. Schenkman had encountered no problems in the robotic cases he had performed. Riley told Dr.

Schenkman at their first meeting, and also at later encounters, that he wanted Dr. Schenkman to perform the surgery.

9. On June 5, 2006, Riley met with David Boss, a physician's assistant for the urology department at WRAMC, and Riley signed a consent form presented to him by Boss. The preprinted form said that the surgery was to be "performed by or under the direction of Dr. _____," and Dr. Schenkman's name was inserted into the blank by Boss. Neither Boss nor any other WRAMC employee called Riley's attention to this language, and no one ever told him that this language could be used to justify switching surgeons to someone much less experienced than Schenkman.

10. Unknown to Riley until months later, Schenkman substituted one of his junior surgeons, Stacey Koff, as the primary surgeon on Riley's case. Schenkman was listed on the operative forms as Koff's first assistant surgeon.

11. Schenkman never asked for Riley's consent to have Koff as the primary operator. Riley would have never given such consent, since he wanted as his primary operator the surgeon at WRAMC who had the most experience with the daVinci robot, and Riley believed that to be Schenkman, the chair of the department of urology at WRAMC.

12. Riley never met Koff until sometime after the surgery. (She in fact never revealed to Riley that she had been the primary operator on him.) According to information he has learned since, she finished her urology residency in 2005, so would have had barely one year of experience as a full attending surgeon at the time she became the primary operator for Riley.

13. The daVinci robot at that time was equipped so that only the primary operator had a three-dimensional view of the operative site. An assistant surgeon could observe the operative site, but only two-dimensionally, and so could not make immediate corrections of the placement of instruments.

14. Thus the daVinci robot did not permit meaningful direction of the surgery by Schenkman, even if Riley had agreed, which he did not, that Schenkman could direct Koff's work with Koff as primary operator.

15. There is a well-known relationship in surgery between operator experience and risk of complications, with more experienced surgeons having fewer serious complications. This is particularly true with surgery to remove the prostate gland for cancer, and is also true for robotic surgery, which has a steep "learning curve."

16. With Koff at the controls as the primary operator for Riley's case, the surgery on June 12, 2006 took far longer than it should have and was marred by complications that a more experienced surgeon would have been much less likely to experience:

    a. Anesthesia was induced at 6:30 am, but surgery did not begin until 8:40 am. The records are silent about why it took so long to begin the procedure, which ordinarily would start as soon as anesthesia is adequately induced.

    b. The surgery was recorded as lasting from 8:40 am to 3:15 pm, or six hours and 35 minutes. The average time for an open radical prostate removal is around two and one-half hours and should be similar for a robotic technique.

    c. Koff tore the patient's rectum and had to make a 3-layer repair of the rectum. Apparently due to a failure to timely appreciate and respond to the bleeding, Koff allowed so much bleeding to occur that the patient needed two units of blood transfused in the operating room and another unit later that evening in recovery.

    d. Koff lost a needle in the patient's pelvis as she was stitching his urethra. She tried to locate it, but could never retrieve the needle, which remains in his pelvis today.

    e. Koff's inexperience prolonged the surgery and caused complications to Riley in other ways.

17. Throughout the surgery, Riley's body was placed into a steep head-down or Trendelenburg position.

18. Riley experienced loss of blood pressure at various times while under anesthesia and during the operation.

19. Riley woke from anesthesia and soon complained of seeing a "purple haze" in both eyes. Visual testing found that he was blind in both lower visual fields. Ophthalmologists at WRAMC diagnosed him as having experienced permanent optic nerve damage known as posterior ischemic optic neuropathy (PION), which they said was likely due to the length of time he was in the head-down position in the operating room.

20. Riley also experienced urinary incontinence, which eventually required surgical placement of an artificial sphincter in his urethra, and erectile dysfunction as a result of Koff's procedure.

21. The defendant's employees were negligent and caused serious permanent injury to the patient, in the following ways:
    a. Failing to keep his blood pressure well-controlled before and during the procedure, which was necessary to protect him from optic nerve injury;
    b. Allowing the procedure and the anesthesia time to extend far beyond the safe and ordinary time, which also contributed to his optic nerve injury because of the patient's head-down position during most of this time;
    c. Tearing the patient's rectum and failing to fix it promptly, which caused significant blood loss requiring transfusions;
    d. Losing a needle in the patient's pelvis;
    e. Causing damage to the urethra and to the nerves controlling sexual function;
    f. Allowing Koff to continue as the primary operator after it became obvious that her inexperience was causing delays and multiple avoidable injuries.
22. The defendant's employees also were negligent by misleading Riley about who would be his primary operator and by failing to honor his specific request that Schenkman perform the surgery.
23. Riley would have never consented to the surgery if he had known Schenkman's plan to substitute Koff as the primary operator, nor would any reasonable patient have consented.
24. Riley would have never signed the consent form if he had known that WRAMC intended the language "by or under the direction of" to allow Schenkman to switch roles with Koff and make her the primary operator.

25. A material risk of the robotic surgery proposed by the defendant's employees to Riley was that he would experience a higher risk of permanent, serious complications of all types, both common and uncommon, if the surgery was done by an inexperienced operator.

26. The decision of the defendant's employees to subject Riley to the higher risk of permanent, serious complications with an inexperienced operator, in defiance of his specific request and without informing him of the switch of surgeons, was negligent and otherwise wrongful, and violated Riley's right to make an informed choice about his surgery.

27. The failure of the defendant's employees to obtain Riley's informed consent for the surgery makes the defendant liable for all his injuries experienced as a consequence of the surgery, whether or not such injuries in and of themselves were negligently caused.

28. Riley experienced permanent and serious injuries because of the wrongful conduct of defendant's employees, including loss of visual fields which prevents him from piloting airplanes and puts him at risk for trip-and-fall injury, urinary incontinence, erectile dysfunction, loss of quality of life, pain and suffering, the need for medical treatment, medical and other incidental expenses, and other damages.

29. Plaintiff demands judgment against the Defendant in the amount of $750,000, plus interest and costs.

Respectfully submitted,

*[signature]*

Patrick A. Malone, Esq. (D.C. Bar No. 397142)
Daniel C. Scialpi, Esq. (D.C. Bar No. 997556)
PATRICK MALONE & ASSOCIATES, P.C.
1111 16th Street, N.W.
Suite 400
Washington, D.C. 20036
P: 202-742-1500
F: 202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com